SHIELDS PETITTI & ZOLDAN, PLC
5090 N. 40th Street, Suite 207
Phoenix, Arizona 85018
Telephone: (602) 718-3330
Facsimile: (602) 675-2356
E-Mail: sno@shieldspetitti.com
E-Mail: mjp@shieldspetitti.com
E-Mail: docket@shieldspetitti.com

Sarah N. O'Keefe – 030131
Michael J. Petitti, Jr. – 011667
*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Kathleen Iudicello,<br><br>Plaintiff,<br><br>v.<br><br>Arizona Western College, a political subdivision of the State of Arizona; District Governing Board For Arizona Western College, a public governing body; Brad Sale, in his individual and official capacities; DR. Kenneth MacFarland, in his individual and official capacities, Dennis Booth, in his individual and official capacities, Olivia Zepeda, in her individual and official capacities, Maria Chaavoya, in her individual and official capacities; and Dr. Daniel Corr, in his individual and official capacities;<br><br>Defendants. | Case No.<br><br>**COMPLAINT** |

Plaintiff, Kathleen Iudicello ("Plaintiff" or "Dr. Iudicello"), as and for her Complaint against Defendants Arizona Western College; the District Governing Board for Arizona Western College; District Governing Board for Arizona Western College Board Members: Brad Sale, Dr. Kenneth MacFarland, Dennis Booth, Olivia Zepeda, and Maria Chaavoya; and Defendant College President for AWC, Dr. Daniel Corr, alleges as follows:

## GENERAL ALLEGATIONS

### (Parties and Jurisdiction)

1. Dr. Iudicello was a resident of Yuma County at all relevant times. Dr. Iudicello is a "citizen of the United States" within the meaning of *42 U.S.C. § 1983*, and a "person" within the meaning of *42 U.S.C. § 1983*. At times relevant hereto, Dr. Iudicello was an employee of Arizona Western College.

2. Defendant Arizona Western College ("AWC") is a public community college, established under Arizona Revised Statutes ("*A.R.S.*") *§§ 15–1401 et seq.*, and operates as part of Arizona's public community college district system. Defendant AWC is a political subdivision of the State of Arizona, offering higher education degrees and instruction, and operating in Yuma and La Paz County. As a public entity created by state law, Defendant AWC is a "person" within the meaning of *42 U.S.C. § 1983*. At all times relevant, Defendant AWC acted under color of state law.

3. Defendant District Governing Board for AWC (the "Board") is an agent and the duly authorized public governing body responsible for the governance and oversight of Defendant AWC. It is authorized to sue and be sued. A.R.S. § 15-1444(A)(b). At all times material herein, Defendant Board was an employer within the meaning of *42 U.S.C. § 12111(5)*. At all times relevant, Defendant Board acted under color of state law.

4. Defendants Brad Sale, Dr. Kenneth MacFarland, Dennis Booth, Olivia Zepeda, and Maria Chaavoya are members of the Board ("Board Members"). At all relevant times

herein, they were acting for and on behalf of Defendant AWC and their actions were in the course and scope of their authority. Defendant Board Members are sued in both their individual and official capacities and are personally liable for the violations of law and relief claimed herein. At all times, Defendant Board Members acted under color of state law.

5. Defendant Dr. Daniel Corr ("Defendant Corr") is the College President for Defendant AWC. As such, he is responsible for overseeing college operations and staff. Defendant Corr is sued in both his official and individual capacities and is personally liable for violations of law and relief claimed herein. At all times relevant, Defendant Corr acted under color of state law.

6. Defendants have committed actions and caused events to occur in the County of Yuma, State of Arizona, which are the foundation of this action and out of which this action arises.

## NATURE OF ACTION

7. This is an action brought by Plaintiff to vindicate violations of Arizona's Employment Protection Act, *A.R.S. § 23-1501*; and *42 U.S.C. § 1983*.

8. This Court has jurisdiction over this matter pursuant to *28 U.S.C. § 1331* because this is a civil action arising under the laws of the United States. This Court also has jurisdiction under *28 U.S.C. § 1343(a)(3)* because this action seeks to redress the deprivation, under color of state law, of rights secured by the Constitution and laws of the United States. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to *28*

*U.S.C. § 1367(a)* because they are so related to the federal claims in this action that they form part of the same case or controversy under Article III of the United States Constitution.

9. Venue is proper in the District of Arizona because Defendants conduct business in the judicial district and events giving rise to the claims occurred within this judicial district. *28 U.S.C. § 1391(b)*.

10. Plaintiff has complied with Arizona's Notice of Claim statute, *A.R.S. § 12-821.01*.

## JURY DEMAND

11. Pursuant to *Rule 38* of the *Federal Rules of Civil Procedure*, Plaintiff requests a trial by jury of any issue triable of right by a jury.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

12. AWC is accredited by the Higher Learning Commission.

13. AWC participates in Dual Enrollment programs allowing high school students the opportunity to take AWC's college-level courses at their high schools, fulfilling both high school graduation requirements, and earning transferable college credits.

14. Dual Enrollment is financially beneficial for community colleges like AWC, because the Arizona Department of Education ("ADOE") reimburses community colleges who provide dual enrollment classes, thereby increasing the college's funding.

15. Colleges must follow specific rules to reap the added financial benefits of offering a Dual Enrollment program. For example, *A.R.S. § 15-1821.01*, as it relates to Dual

Enrollment, provides:

> (3) The courses shall be previously evaluated and approved through the curriculum approval process of the district, shall be at a higher level than taught by the high school and shall be transferable to a university under the jurisdiction of the Arizona board of regents or be applicable to an established community college occupational degree or certificate program. . .
>
> * * *
>
> (4) College-approved textbooks, syllabuses, course outlines and grading standards that are applicable to the courses if taught at the community college shall apply to these courses and to all students in the courses offered pursuant to this section. The chief executive officer of each community college shall establish an advisory committee of full-time faculty who teach in the disciplines offered at the community college to assist in course selection and implementation in the high schools and to review and report at least annually to the chief executive officer whether the course goals and standards are understood, the course guidelines are followed and the same standards of expectation and assessment are applied to these courses as though they were being offered at the community college. The advisory committee of full-time faculty shall meet at least three times each academic year.
>
> (5) Each faculty member shall meet the requirements established by the governing board pursuant to section 15-1444. The chief executive officer of each community college district shall establish an advisory committee of full-time faculty who teach in the disciplines offered at the community college district to assist in the selection, orientation, ongoing professional development and evaluation of faculty who are teaching college courses in conjunction with the high schools. The advisory committee of full-time faculty shall meet at least two times each academic year.

16. The Higher Learning Commission ("HLC"), the agency accrediting Defendant AWC's higher education institution, provides Institutional Policies and Procedures for Determining Faculty Qualifications and Criteria for Accreditation and Assumed Practices

reflecting:

> In 2023, the HLC Board of Trustees revised the Assumed Practices to further clarify that an institution must establish and maintain policies and procedures for determining that faculty are qualified; and that an institution could consider a variety of factors as part of these policies and procedures. HLC's Board of Trustees has also extended the date of compliance with the Assumed Practice related to faculty qualifications in the context of dual credit to allow institutions time to work through the details of the requirement until September 1, 2025. These extensions remain in place following the 2023 revisions.
>
> * * *
>
> Pursuant to this Assumed Practice, faculty should participate substantially in the establishment of institutional policies and procedures for faculty qualifications.

17. The HLC's Dual Credit Guidelines direct that:

> The institution uses the same policies and procedures for determining faculty qualifications for faculty in dual credit courses or programs that it does for its other higher education courses.

18. The HLC's Assumed Practices states that:

> The institution remains in compliance at all times with all applicable laws, including laws related to authorization of educational activities and consumer protection wherever it does business.

19. Defendant AWC is required to structure its Dual Enrollment program accordingly in order to comply with *A.R.S. § 15–1821.01* and the HLC's accreditation guidelines.

20. In August of 2022, AWC received communication from the HLC stating that, "In 2016, your institution applied for and was granted an extension for bringing its faculty for dual credit programs into compliance with HLC's faculty qualification requirements" by September 1, 2025. This extension required the compliance with State Statute *A.R.S. § 15–1821.01*, federal standards of accreditation, and the HLC's accreditation requirements.

21. On March 13, 2023, Dr. Iudicello participated in an extensive interview and conversation regarding the position of Vice President of Learning Services at AWC with Defendant Corr, where the main focus was how Dr. Iudicello could support Defendant Corr's vision to grow Dual Enrollment. Dr. Iudicello shared her ideas, expertise, and vision, and Defendant Corr communicated support, enthusiasm, and alignment with Dr. Iudicello.

22. On March 14, 2023, Dr. Iudicello was offered and accepted the position of Vice President of Learning Services, earning an annual salary of $152,250, as well as fringe benefits and Arizona State Retirement System retirement contributions.

23. On March 22, 2023, College President, Defendant Corr recorded and published a video message entitled "the Corr Report (3/22/23) – Spring '23 Budget & HLC Updates, VPLS, Construction Progress." This video announces Dr. Iudicello's hiring and Defendant Corr's enthusiasm wherein he highlights Dr. Iudicello's extensive expertise in the Dual Enrollment arena and shares that she is an "expert when it comes to HLC and accreditation matters" and that she is "certainly very versed in Dual Enrollment and keenly aware of our desire to greatly expand our Dual Enrollment footprint."

24. In a press release on April 5, 2023, Defendant Corr was quoted regarding Dr. Iudicello's hiring, stating that: "Over her 20-plus year career, Dr. Kathleen Iudicello has served at Arizona community colleges as an educator and leader committed to success at every level, from faculty member to Vice President. This experience and service speaks directly to her dedication to the student experience and the impact education has within our communities. I am thrilled to have a talented and collaborative leader as our next Vice President of Learning Services who will join our community and further our students' success."

25. On July 10, 2023, Dr. Iudicello started as the Vice President of Learning Services ("VPLS") for AWC.

26. As the VPLS, Dr. Iudicello was also the Chief Academic Officer for AWC, responsible for the scope, sequence, and integrity of its academic programs; providing oversight to AWC's academic departments, including leadership, planning, policy and budget development and management; overseeing all aspects of Learning Services, Faculty, Faculty Instruction and Development, and operational relationships to maintain HLC Accreditation and compliance; and the academic and instructional component of AWC's Dual Enrollment program. Student Success metrics and maintenance of degree completion are also crucial to this role.

27. Dr. Iudicello reported directly to Defendant Corr.

28. In August of 2023, Dr. Iudicello created the Dual Enrollment Faculty Liaison

position (the "Liaison") to comply with *A.R.S. § 15–1821.01*, thereby establishing clear communication pathways between Dual Enrollment instructors and AWC's faculty to offer the required support regarding the utilization of the college's course syllabi, curriculum, assessments, and to ensure adherence to all related policies, procedures, and legally mandated standards.

29. The Liaison role that Dr. Iudicello sought to implement was subsequently rendered ineffective because Defendant Corr later directed that only the Early College Team could communicate with the high schools. The Early College Team, however, did not include any full-time AWC faculty, and is housed under Student Services, which was not under Dr. Iudicello's purview as the VPLS.

30. Dr. Iudicello repeatedly expressed compliance concerns to Defendant Corr regarding his persistent demands for AWC's Dual Enrollment program. Specifically, Dr. Iudicello informed Defendant Corr that his current designs for the college's Dual Enrollment program did not comply with *A.R.S. § 15–1821.01* or the HLC's Accreditation Guidelines.

31. AWC was not ensuring transferability of Dual Enrollment credits, did not have a faculty advisory committee, faculty were not substantially participating in the development of faculty qualifications, and AWC was not using the same standards, policies, and procedures for instructors teaching Dual Enrollment as it does for the same higher education courses taught at the on-campus location for AWC.

32. In continued noncompliance, AWC was staffing Dual Enrollment courses at

the high schools with instructors who only hold a Bachelor's degree. However, AWC required a Master's degree, at minimum, for its full-time and adjunct faculty on-campus.

33. Dr. Iudicello's position as AWC's Chief Academic Officer ("CAO") and Accreditation Liaison Officer ("ALO") held her to high standards to ensure the college was following all required policies, procedures, and legal requirements.

34. If Dr. Iudicello were to have supported Defendant Corr's demands regarding Dual Enrollment, she would have violated *A.R.S. § 15–1821.01*, the HLC's accreditation guidelines and would have knowingly put the college's accreditation at risk, as well as jeopardized her career and reputation.

35. On August 10, 2023, in response to an email from a fellow concerned faculty member, who was selected as the Liaison, Dr. Iudicello shared her concerns that AWC was not in compliance. Defendant Corr denied that the college was "falling short of HLC compliance."

36. After continuing to receive complaints and concerns from other faculty members, Defendant Corr sent an email on October 25, 2023, stating it was his "firm expectation" to "implement our use of a waiver related to dual enrollment by Spring 2024."

37. Implementation under Defendant Corr's direction would have been a violation of State Statute (*A.R.S. § 15–1821.01*) and HLC guidelines due to a failure to create a Faculty Advisory Committee, not utilizing the same curriculum inclusive of standard assessments, not ensuring transferability, not having substantive participation of the faculty, and not using

the same standards, policies and procedures for faculty in dual credit as it does for other higher education courses taught at AWC.

38. AWC had no "special waiver" that allowed for flouting of the statute's mandate or the HLC's guidelines.

39. The HLC had only issued an "extension" of time for AWC to become fully compliant, which was the same extension provided to all Arizona community colleges.

40. Dr. Iudicello and faculty members continued to make suggestions and requested to provide input on the qualifications for Dual Enrollment instructors, along with meetings "so that curriculum experts can discuss these changes with academic leadership and provide recommendations/guidance based on their expertise in their curriculum and associated pedagogical approaches."

41. However, on October 31, 2023, Defendant Corr again refused the suggestions, stating "we stay the course."

42. In December of 2023, in response to concerned faculty, Dr. Iudicello developed a Dual Enrollment Faculty Taskforce ("Taskforce"), as required by *A.R.S. § 15–1821.01*. The Taskforce consisted of discipline-specific full-time faculty providing the required information as outlined by the State Statute and providing the support that faculty were seeking.

43. The Taskforce provided advice to Defendant Corr regarding compliance and sought to meet with him regarding its concerns.

44. Defendant Corr never met with the Taskforce and disregarded advice the Taskforce provided.

45. On February 8, 2024, Dr. Iudicello shared with Defendant Corr a document articulating the Taskforce's concerns regarding Dual Enrollment. The next day, Defendant Corr responded to Dr. Iudicello, reiterating his directives, which were still devoid of the Faculty Advisory Committee's input and still not in compliance with the State Statute or the HLC's requirements.

46. On February 12, 2024, in a meeting with Defendant Corr, the President of the Faculty Senate for AWC reiterated the faculty's disapproval of the direction Defendant Corr was mandating.

47. On May 13, 2024, in a follow-up email to the Faculty Senate meeting held on May 6, the President of the Faculty Senate communicated that AWC faculty voted in favor of making no changes to the Dual Enrollment standards, reiterating that the Faculty Senate did not approve of the new standards or direction Defendant Corr mandated. The President of the Faculty Senate shared that the Faculty Senate could not find any other record of a community college utilizing the HLC "waiver" in the way that Defendant Corr intended, communicated, and demanded.

48. Dr. Iudicello confirmed with AWC's HLC Liaison that the college's hiring standards needed to be the same for all faculty, including the staffing of Dual Enrollment instructors. The HLC Liaison further explained that Dual Enrollment instructors needed to

have the same syllabus, assessments, curriculum, outcomes, and materials as any AWC course.

49. Dr. Iudicello inquired with the HLC Liaison about Defendant Corr's assertion that the college had a special waiver. The HLC Liaison explained that AWC had the same waiver as other community colleges, namely the waiver simply provided institutions with an extension of time for currently employed instructors to earn the credentials required per HLC policy. The HLC Liaison further explained that the waiver was never an approval for "new faculty to continue to be hired without meeting the qualification requirements."

50. Dr. Iudicello made numerous attempts to bring AWC into compliance, including meeting with members of the State Department of Education, among others, who confirmed AWC's current practices were not compliant.

51. On July 1, 2024, after conducting extensive good faith research efforts, including meeting with relevant individuals across the state, including other Chief Academic Officers, as well as members from the Arizona Department of Education, Dr. Iudicello provided Defendant Corr with her updated research that provided various ways to meet Defendant Corr's vision of increasing Dual Enrollment and again emphasized that his designs were not compliant with the State Statute or the HLC's Guidelines. Dr. Iudicello also shared with Defendant Corr that she had met with members of the State Department of Education who confirmed AWC was not in compliance.

52. Defendant Corr continued to vehemently deny that his plan was not in

compliance and threatened Dr. Iudicello, stating: "You are fishing around to undercut me and this institution and that may not be a smart thing to do." He continued, stating: "…I don't think that's wise to undercut the interests of this institution," and accused Dr. Iudicello of "actively working against the interests of the institution."

53. Dr. Iudicello emphasized that as the CAO and ALO, she could not allow this non-compliance. Dr. Iudicello also explained to Defendant Corr that there are other ways to achieve the growth he sought, stated she supported his vision to increase Dual Enrollment, and wanted to continue to discuss ways to ensure AWC becomes compliant.

54. Defendant Corr sits on the State Board of Education and a HLC Board, and as the AWC President, he is aware of the need to be compliant with state law and the HLC's requirements, as well as the obligations of the CAO and ALO to uphold that compliance or risk the accreditation of the college.

55. In July, Dr. Iudicello received an email from the Vice President for Student Services, stating: "It's very clear in the IGA (section 4) about our obligation to provide instruction regarding Dual Enrollment Courses." This section specifically references the College's obligation to ensure all Dual Enrollment courses meet a set of standards as outlined by *A.R.S. 15–1821(3-5)*.

56. On July 10, 2024, in response, Dr. Iudicello sent an email to the Early College Team informing them that they needed to "put a hold on offering any Dual Enrollment courses taught by a teacher with a bachelor's degree."

57. Dr. Iudicello called a meeting the next day with Defendant Corr and AWC's HLC Liaison. In that meeting, the HLC Liaison informed Defendant Corr that teachers with a Bachelor's Degree only could teach: if policies and procedures were in place to ensure that the college was evaluating the instructors' content knowledge; the instructors were using the college's evaluation tools and syllabi; and if AWC was assessing and confirming that Dual Enrollment students with Bachelor's Degree instructors were doing as well as campus students with graduate degree faculty. Defendant Corr told the HLC Liaison that the college had such practices in place. This was false.

58. The next day, Defendant Corr sent an email to the President's Cabinet, Learning Services Associate Deans, Faculty Senate Leadership, the Dual Enrollment Faculty Liaison, and the Early College Team regarding the meeting with HLC Liaison. Defendant Corr falsely stated that he had confirmed the HLC's support for his direction and stated, "it is my expectation that we continue our current practice of differentially credentialing dual credit instructors without delay or pause."

59. On July 16, 2024, because Defendant Corr continued to manipulate and mislead AWC faculty regarding its lack of Dual Enrollment compliance, Dr. Iudicello sent an email again requesting Learning Services Associate Deans and the Early College Team "remove the approval of teachers with a Bachelor's Degree in Education from Dual Enrollment courses."

60. The following day, Defendant Corr emailed Dr. Iudicello expressing

disappointment with the email she sent, stating she "completely contradicted [his] explicit direction" and that he "would like to schedule a Human Resources mediated conversation." Defendant Corr further stated "Until we have that conversation, you are directed to have no communication that contradicts my direction as it relates to Dual Enrollment. Given our current lack of alignment, I am temporarily removing you from any responsibility regarding dual enrollment."

61. Defendant Corr also sent an email to Learning Services Associate Deans and the Early College Team directing them to cease any and all communication with Dr. Iudicello regarding early college/Dual Enrollment.

62. On August 6, 2024, Defendant Corr and the Chief Human Resources Officer, met with Dr. Iudicello, wherein Defendant Corr accused Dr. Iudicello of insubordination when she sent the email asking the Associate Deans to stop staffing Dual Enrollment courses with only Bachelor's-Degree-holding-high-school teachers while she worked to bring the college into compliance.

63. Dr. Iudicello was continuing to abide by State Statutes and HLC requirements and perform her role appropriately when she sent that email, and explained it was merely a pause to give them a chance to meet their compliance responsibilities for the Spring of 2025.

64. Defendant Corr continued to emphasize that her email directly opposed his and reiterated to Dr. Iudicello that she was removed from Dual Enrollment, forbade her from attending the upcoming President's Cabinet, stating he could not trust her and her role as

AWC's ALO would likely change.

65. Pursuant to Defendant Corr's directives, Dr. Iudicello sent an email to the Learning Services team repeating that she would no longer be involved with Dual Enrollment.

66. On August 12, 2024, Defendant Corr sent another email accusing Dr. Iudicello of not following his directives and on August 19, 2024, Defendant Corr scheduled another meeting with Dr. Iudicello. He proceeded to ask Dr. Iudicello if she liked working at AWC and then continued to imply that if she did not agree with him, she would be fired.

67. Defendant Corr next demanded that Dr. Iudicello send apology emails to the President's Cabinet, as well as himself, for her recent allegedly disrespectful behavior. Dr. Iudicello did so that same day, August 19, 2024.

68. Unsatisfied with Dr. Iudicello's original apology emails, and after multiple exchanges with revisions, Defendant Corr finally approved a revised set of apology emails, which Dr. Iudicello then sent.

69. Dr. Iudicello's colleagues noticed Defendant Corr's subjugation and asked Dr. Iudicello if she was okay, expressing concern for her well-being.

70. On August 27, 2024, Defendant Corr interrupted Dr. Iudicello while she was presenting at a meeting. Later the same day, he visited the campus where Dr. Iudicello was holding another meeting and greeted all participants by name, except for her, pointedly shunning her in front of her colleagues.

71. On October 14, 2024, in a meeting with faculty that the Faculty Senate invited him to, Defendant Corr represented that he "has not discussed the HLC requirements" with AWC's University partners, stating further that at AWC the "minimum requirements to teach are a Master's in the subject area or a Master's plus 18 hours in a subject area for transferable courses"; however, for Dual Enrollment instructors "all they needed was certification or three years teaching experience and that they are better suited for teaching young kids."

72. Defendant Corr continued to state that Dual Enrollment instructors "do not have to use our curriculum or material." Continuing to contradict the State Statute, as well as the HLC's guidelines, Defendant Corr also stated that he has the "final decision on dual enrollment" and this was "his idea" and he "backs what is being done."

73. On October 30, 2024, Dr. Iudicello met the Maricopa County Community College District's ("MCCCD") Faculty Association President at an event. Dr. Iudicello shared her concerns regarding AWC's lack of compliance. The MCCCD Faculty Association President expressed surprise, disappointment, and concern. During this interaction, Defendant Corr keenly watched Dr. Iudicello's interaction with the Faculty Association President and at one point, intervened in their conversation, attempting to intimidate Dr. Iudicello.

74. On November 1, 2024, AWC's Faculty Senate President met with Dr. Iudicello regarding Defendant Corr's approach to Dual Enrollment.

75. On November 6, 2024, Dr. Iudicello received further communication from the

Faculty Senate President that he had learned that AWC has no plan for assessing the Dual Enrollment courses and instructors, despite the accreditation mandate and State Statute's requirements. He expressed concern that Dual Enrollment instructors were not receiving the same curriculum or materials as other faculty at AWC teaching the same course.

76. By this point, Defendant Corr had already restricted AWC's faculty from communicating with Dual Enrollment instructors, and no Faculty Advisory Committee existed. Additionally, because Defendant Corr had previously removed Dr. Iudicello from all items related to Dual Enrollment, she was unable to take further action, even in light of Faculty Senate President's findings.

77. On November 26, 2024, in a meeting with Defendant Corr, wherein he commended Dr. Iudicello for abiding by his directives to stay out of Dual Enrollment, Dr. Iudicello commented that although Defendant Corr had removed her from Dual Enrollment, as the ALO, she still had a duty to share information to ensure AWC's compliance.

78. On December 9, 2024, an email was sent to the President's Cabinet, providing an updated agenda that now included an Executive Session to discuss a personnel matter for their upcoming meeting.

79. The Executive Session concerned Dr. Iudicello and her termination.

80. Dr. Iudicello was not provided with any written notice of the Executive Session, nor was she afforded an opportunity to request that the matter be discussed in a public forum.

81. On December 10, 2024, Defendant Corr fired Dr. Iudicello.

82. In so doing, he stated that they never "got in alignment" and that separating her from AWC was best.

83. Defendant Corr fired Dr. Iudicello in retaliation for her refusal to acquiesce to his directive to continue to violate the State Statute and the HLC's mandates as they relate to Dual Enrollment.

84. Upon termination, Dr. Iudicello was told to immediately leave AWC's campus. She left behind her work belongings, including her AWC computer. However, because Dr. Iudicello had signed in to her personal Gmail account on her AWC work computer previously, her log-in information was stored.

85. On the day of Dr. Iudicello's termination, a colleague attempted to email Dr. Iudicello on her personal Gmail email account but received a message with the statement that Dr. Iudicello's email had been blocked.

86. The following day, on December 11, 2024, the District Governing Board held a meeting and Executive Session in which Dr. Iudicello's termination and dual enrollment was discussed.

87. During that District Governing Board meeting, the Faculty Senate President spoke on behalf of the faculty, stating that the faculty called for the immediate reinstatement of Dr. Iudicello.

88. Another faculty member spoke at the District Governing Board meeting,

highlighting the correlation between Dr. Iudicello's termination and faculty concerns regarding Dual Enrollment.

89. Another AWC faculty member, echoed many of the speakers' statements and the ongoing concerns regarding Dual Enrollment.

90. A full-time faculty member also spoke at the meeting regarding Dr. Iudicello's exemplary service and accomplishments.

91. Upon information and belief, a former full-time faculty member and current adjunct faculty member filed a complaint with the HLC regarding Defendant Corr's handling of Dual Enrollment at AWC, which, upon information and belief, was investigated by the HLC.

92. Prior to this recent HLC complaint, AWC's Dual Enrollment program and concerns about its compliance had also been discussed in the media by at least one reporter.

93. After her termination, Dr. Iudicello attempted to access her own personal and private Gmail account as well as its folders, but found she could not. Dr. Iudicello had been keeping track of relevant information in her personal and private Gmail account in two subfolders called "AWC" and "Wrongful Termination Protection," given the deterioration of Dr. Iudicello's relationship with Defendant Corr and his increasingly threatening and hostile and retaliatory conduct. Dr. Iudicello's other Gmail folders containing her and her family's personal information and data were now inexplicably empty as well.

94. Upon information and belief, AWC, at Defendant Corr's direction, erased Dr. Iudicello's personal and private data from her Gmail account from January 5, 2015, to September 5, 2024.

95. Defendants permanently deleted Dr. Iudicello's personal and private data and files; the professionally related emails and documentation regarding AWC and her wrongful termination that she had preserved; as well as almost a decade's worth of personal and private documentation related to medical records, healthcare information, financial matters, investment data, legal documents, insurance information, purchase history, warranty information, property information, tax material, vehicle data, bills and utilities information, professional communications, and of course, a plethora of personal information related to her daughter and the rest of her family.

96. Also on December 10, 2024, following Dr. Iudicello's termination, her administrative assistant discovered that a digital folder she had maintained on her AWC-issued computer had been completely deleted. The folder contained documents, emails, and notes relevant to Dual Enrollment concerns and meetings involving Dr. Corr and the President's Cabinet. The administrative assistant relayed that no one had physically accessed their shared office space after the termination meeting, leading her to believe the deletion occurred remotely—likely through IT access.

97. Furthermore, upon returning from her termination meeting that same day, Dr. Iudicello found that she was no longer able to sign in to her AWC-issued laptop, which she

had successfully accessed earlier that morning.

98. Upon suspecting a breach, Dr. Iudicello reviewed the devices where her Gmail account was signed in and discovered that all of the devices shown, except for her AWC work computer, were her personal devices that were password protected and secure. Dr. Iudicello next discovered that her personal Gmail account was accessed using both Google Chrome and Microsoft Edge on her AWC computer on December 10; however, she did not access her personal Gmail account from her work computer that day.

99. Per Google Support's advice, Dr. Iudicello went into the Trash folder hoping the deletions were made in error but found her Trash folder empty – meaning whoever deleted Dr. Iudicello's emails and folders on her personal Gmail account took the calculated additional step of emptying the Trash folder to permanently and irreversibly delete the contents. Dr. Iudicello contacted Google again to attempt a recovery, but Google was unable to recover the lost data since it was permanently deleted from the Trash folder. Dr. Iudicello expended significant time, energy and resources to attempt to recover her deleted data, but to no avail.

100. Defendants' actions violated *A.R.S. § 13-2316*; the Arizona State Constitution rights to privacy Article 2, Section 8 which states "No person shall be disturbed in [her] private affairs, or [her] home invaded, without authority of law"; as well as the Fourth Amendment of the United States Constitution, which protects individuals from unreasonable searches and seizures.

101. Defendants also intentionally deleted evidence pertaining to Dr. Iudicello's protected activity and termination, constituting spoilation, for which an adverse instruction to the jury is warranted.

102. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has sustained significant damages. Plaintiff lost her position as Vice President for Learning Services at Arizona Western College, a role in which she intended to serve until retirement. She was twenty months from reaching thirty years in Arizona's State Retirement System, and her termination severely reduced her anticipated retirement benefits and future earning capacity. Given her age, professional standing, and the retaliatory nature of her termination, her ability to secure comparable employment in Arizona has been substantially impaired. In addition to economic losses, Plaintiff has suffered severe reputational harm, emotional distress, anxiety, and physical symptoms. Defendants' intentional deletion of nearly a decade's worth of her personal data—including medical, financial, legal, and family records—has further compounded her injuries, causing irremediable personal and professional loss and necessitating expert forensic intervention. Plaintiff seeks all damages recoverable under law, including lost wages, fringe benefits, retirement contributions, reputational and emotional distress damages, and attorneys' fees.

## <u>FIRST CAUSE OF ACTION</u>

### *A.R.S. § 23-1501* - Violation of the Arizona Employment Protection Act
### (Against Defendants AWC, Board, and Corr)

103. Dr. Iudicello realleges and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

104. Dr. Iudicello was wrongfully discharged in violation of the public policy of the State of Arizona.

105. Arizona law protects an employee from a wrongful, retaliatory termination in violation of a state statute or based upon the employee's disclosure of conduct that she reasonably believes violates or may violate state law.

106. Dr. Iudicello, in good faith, raised several concerns to AWC and Defendant Corr based on her reasonable belief that the college was violating state law by failing to comply with the Dual Enrollment requirements.

107. Defendants' conduct, as outlined above, violates or implicates Arizona State law, including but not limited to *A.R.S. § 15-1821*.

108. Defendants' conduct in terminating Dr. Iudicello's employment because of her advocacy on these issues was in violation of Arizona state law. *A.R.S. § 23-1501*.

109. Defendant Corr's stated reason for terminating Dr. Iudicello's employment was that she did not "align" with his expectations of the role, which was to obediently carry out his directives, even those that violated the law.

110. As a direct, foreseeable, and proximate cause of Defendants' unlawful conduct, Dr. Iudicello has suffered, and continues to suffer, economic injury, mental and emotional distress, humiliation, anxiety, embarrassment, discomfort, and other injuries and irreparable

harm.

111. Defendants' willful and wanton misconduct is so great that it justifies an award of punitive damages.

112. Dr. Iudicello is damaged by Defendants' willful violation of public policy as hereinabove alleged or as proven at trial.

## <u>SECOND CAUSE OF ACTION</u>

### ***42 U.S.C. § 1983*** **– Violation of Plaintiff's First and Fourteenth Amendment Rights**

### **(Against Defendant AWC, Board, Board Members, and Corr)**

113. Dr. Iudicello realleges and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

114. The First Amendment to the United States Constitution protects public employees from retaliation for speaking out on matters of a public concern.

115. The right of Dr. Iudicello to speak freely about matters of public concern is protected by the First and Fourteenth Amendment of the U.S. Constitution. The public has a vital interest in free and open discussions on issues of public importance.

116. Dr. Iudicello exercised her First and Fourteenth Amendment rights by repeatedly speaking out about Defendant AWC's systematic violations of Arizona law (*A.R.S. § 15-1821.01*) and the HLC's accreditation standards regarding Dual Enrollment, including: informing Defendant Corr that his Dual Enrollment practices were noncompliant; convening a taskforce of faculty; reporting concerns to the HLC; communicating these

concerns to outside stakeholders, including MCCCD's Faculty Association President; among other activities.

117. It is a violation of the First and Fourteenth Amendment of the U.S. Constitution for public employers to discriminate against, discipline, or discharge its employees in retaliation for engaging in speech about matters of public concern as private citizen.

118. Dr. Iudicello's speech regarding the College's Dual Enrollment program was vital to free and open discussions on issues of public importance. Dr. Iudicello's speech regarding AWC's Dual Enrollment program was about matters of public concern. Additionally, Dr. Iudicello's speech regarding Defendants' violations of Arizona law relating to these issues also constituted speech about matters of public concern and is protected by the First and Fourteenth Amendment.

119. Dr. Iudicello's speech on these matters was made not as a public employee, but rather as a private citizen.

120. Defendants silenced Dr. Iudicello from speaking out regarding AWC's Dual Enrollment.

121. Defendants discriminated against and ultimately discharged Dr. Iudicello in retaliation for engaging in the above-described protected speech activity.

122. Through this conduct, Defendants retaliated against Dr. Iudicello in violation of the First and Fourteenth Amendment of the U.S. Constitution.

123. At all relevant times, Defendants and/or their agents acted under color of state law, and their actions were taken as public officials and employees of AWC.

124. Defendants' conduct unlawfully chills free and open discussion on issues of public importance and intimidates other public employees and members of the public from similarly engaging in protected speech.

125. In disciplining Dr. Iudicello and retaliatorily terminating her employment, Defendants acted under color of State law, as defined in *42 U.S.C. § 1983*.

126. Defendants' actions were unprivileged and not subject to any immunity.

127. The decision to discipline and terminate Dr. Iudicello's employment in retaliation for her protected First Amendment speech activity was made pursuant to Defendants' policy and/or practice and without regard to whether such actions would otherwise violate an employee's constitutional or other guaranteed rights.

128. Defendants acted jointly to discipline and terminate Dr. Iudicello's employment.

129. Defendants possess the authority to direct, prepare, and review any necessary department-specific policies for Dr. Iudicello's department.

130. Accordingly, Defendants are final policymakers for AWC's policy with respect to the termination of Dr. Iudicello.

131. Such conduct by Defendants was done in knowing, willful, wanton, reckless, and bad faith matter, which violates clearly established constitutional provisions and rights which a reasonable person would have known.

132. As a direct, foreseeable, and proximate result of Defendants' unlawful conduct, Dr. Iudicello has suffered, and continues to suffer, economic injury, mental and emotional distress, humiliation, anxiety, embarrassment, discomfort, and other injuries and irreparable harm. Dr. Iudicello is damaged by Defendants' actions as hereinabove alleged or as proven at trial.

## THIRD CAUSE OF ACTION

### *42 U.S.C. § 1983* – Violation of the Fourth Amendment

### (Against Defendant AWC, Board, Board Members, and Corr)

133. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

134. At all relevant times, Defendants and/or their agents acted under color of state law, and their actions were taken as public officials and employees of AWC.

135. The Fourth Amendment of the United States Constitution guarantees individuals the right to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. This right is enforceable under *42 U.S.C. § 1983*.

136. Dr. Iudicello maintained a private and personal Gmail account, containing personal and professional data.

137. Upon information and belief, on or about December 10, 2024, Defendants and/or their agents accessed Dr. Iudicello's private and personal Gmail account through her work-issued computer – without consent, warrant, subpoena, or other legal authority – and intentionally or negligently deleted emails and files from her personal Gmail account.

138. Upon information and belief, Defendants and/or their agents further emptied the Trash folder in Dr. Iudicello's Gmail account, permanently destroying the contents, including emails related to Dr. Iudicello's wrongful termination and protected activity.

139. Dr. Iudicello had a reasonable expectation of privacy in her private and personal Gmail account, which was protected by personal credentials and accessed solely on her own devices, except during work hours, for legitimate personal use.

140. Defendants' and/or their agents' conduct constituted an unlawful search and seizure under the Fourth Amendment.

141. Their actions were not authorized by any valid legal process and were not supported by any recognized exception to the warrant requirement.

142. In addition, on or about the same day, Dr. Iudicello's administrative assistant discovered that a folder she maintained on her work computer—containing materials related to Dual Enrollment concerns and institutional meetings—had been fully erased. This deletion occurred without her consent and without physical access to the office, suggesting remote IT-based intrusion. This supports an inference that Defendants or their agents engaged in a coordinated effort to access and destroy digital material tied to protected activity.

143. As a direct and proximate cause of Defendants' and/or their agents' actions, Dr. Iudicello suffered the loss of irreplaceable personal and professional data, significant emotional distress, reputational harm, and other damages. Plaintiff is damaged by Defendants' and/or their agents' actions as hereinabove alleged or as proven at trial.

## FIFTH CAUSE OF ACTION

**Violation of the Computer Fraud and Abuse Act ("CFAA"), *18 U.S.C. § 1030, et. seq.***

**(Against Defendant AWC, Board, Board Members, and Corr)**

144. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

145. The CFAA prohibits individuals from intentionally accessing a computer without authorization or exceeding authorized access and thereby obtaining information, causing damage, or committing fraud.

146. Upon information and belief, on or about December 10, 2024, Defendants, or agents acting on their behalf, accessed Dr. Iudicello's private and personal Gmail account without authorization via her work-issued computer.

147. Dr. Iudicello had previously used this device for personal matters and remained signed into her private Gmail account, which was protected by secure credentials.

148. Upon information and belief, Defendants permanently deleted data and folders containing nearly a decade's worth of personal and professional information, including sensitive legal, medical, and financial records, as well as folders labeled "AWC" and

"Wrongful Termination Protection."

149. These deletions included deliberately emptying the Trash folder, an additional step that ensures the permanent and irrevocable destruction of data. Google has confirmed that no recovery is possible once the Trash folder is emptied.

150. Dr. Iudicello did not authorize Defendants to access or delete her personal Gmail data.

151. No legitimate business reason existed to access her private email account.

152. The conduct of Defendants constitutes a violation of the CFAA, including but not limited to:

- *§ 1030(a)(2)(C)*: Intentionally accessing a computer without authorization and obtaining information from a protected computer;
- *§ 1030(a)(5)(A)–(C)*: Knowingly causing the transmission of a command that resulted in the damage and loss of data on a protected computer, without authorization;
- *§ 1030(a)(4)*: Accessing a protected computer without authorization with intent to defraud and causing loss as a result of such conduct.

153. Dr. Iudicello has suffered damage and loss as defined by *18 U.S.C. § 1030(e)(8)*, including loss of data, time, and resources to attempt recovery and assess the breach. She has also suffered consequential economic harm and emotional distress resulting from the destruction of irreplaceable personal and professional information, as well as fear

for identity theft and unauthorized persons potentially obtaining access to her data and information.

154. Pursuant to *18 U.S.C. § 1030(g)*, Dr. Iudicello is entitled to recover compensatory damages, injunctive relief, and any other equitable relief the Court deems just and proper. Plaintiff is damaged by Defendants' actions as hereinabove alleged or as proven at trial.

## SIXTH CAUSE OF ACTION

**Violation *of Article 2, § 8 of the Arizona Constitution* – Intrusion into Private Affairs (Against Defendant AWC, Board, Board Members, and Corr)**

155. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

156. *Article 2, § 8 of the Arizona Constitution* provides: "No person shall be disturbed in [her] private affairs, or [her] home invaded, without authority of law."

157. Dr. Iudicello had a legitimate expectation of privacy in the contents of her personal and private Gmail account, which she accessed using a secure login and password-protected credentials, including while using her AWC-issued computer.

158. Upon information and belief, on or about December 10, 2024, Defendants accessed Dr. Iudicello's personal Gmail account without her consent or legal authority and deleted substantial portions of her personal and private digital files, including emails, documents, and folders of legal relevance.

159. Upon information and belief, at the time of the deletion, Dr. Iudicello was no longer an employee of AWC, and her work-issued computer had been returned pursuant to termination instructions. The intrusion was therefore not only unauthorized but undertaken in direct violation of Arizona's constitutional protections.

160. Defendants' actions constituted an unreasonable and unlawful disturbance of Dr. Iudicello's private affairs without legal justification or warrant.

161. Arizona law recognizes a private right of action for damages arising from violations of the state constitution where, as here, there is no adequate statutory remedy and the violation is egregious.

162. As a direct and proximate cause of Defendants' conduct, Dr. Iudicello suffered emotional distress, loss of irreplaceable personal data, legal prejudice in connection with pending claims, and other consequential damages. Plaintiff is damaged by Defendants' actions as hereinabove alleged or as proven at trial.

## SEVENTH CAUSE OF ACTION

### Common Law Invasion of Privacy

163. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

164. Defendants intentionally interfered with and invaded Dr. Iudicello's privacy by inspecting and intruding into her personal and private Gmail account.

165. This interference and intrusion was highly offensive and would be highly

offensive to a reasonable person.

166. Dr. Iudicello had an objectively reasonable expectation of privacy and seclusion in her personal and private Gmail account.

167. The interference and intrusion caused Plaintiff damage and injuries.

168. Plaintiff is damaged by Defendants' actions as hereinabove alleged or as proven at trial.

## CONCLUSION AND PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests Judgment in her favor and against Defendants, each of them, as follows:

A. For all injunctive and declaratory relief necessary, including a declaration that Defendants' conduct violated *42 U.S.C. § 1983*;

B. Declare that Defendants violated Plaintiff's rights by unlawfully depriving her of her rights and privileges afforded by the U.S. Constitution;

C. Declare that Defendants violated Plaintiff's rights as guaranteed by *A.R.S. §§ 23-1501* and *38-431*;

D. Award Plaintiff monetary damages in the form of backpay compensation, lost benefits, unpaid entitlements, plus prejudgment and post-judgment interest;

E. Award Plaintiff compensatory damages for the violations of Plaintiff's rights and the harm to her reputation, humiliation, emotional and mental anguish, and for other financial and consequential harm and injuries she has suffered as a result of Defendants' wrongful conduct;

F. Award Plaintiff punitive damages to redress the knowing, willful, wanton, reckless, and bad faith nature of Defendants' violation of Plaintiff's rights;

G. Order Plaintiff reinstated to her former position, or in the alternative, award existing and future lost wages and benefits (front pay);

H. Order Defendants to correct Plaintiff's personnel record to reflect the facts;

I. Award such other monetary, injunctive, equitable, and declaratory relief as the Court deems just and proper;

J. Award Plaintiff's reasonable attorneys' fees and costs pursuant to *42 U.S.C. § 1988(b)* and any other applicable statute, rule, or regulation;

K. For interest on each element of damage, cost or attorneys' fees at the highest legal rate from the date such damage, cost or attorneys; fees were incurred until paid; and

L. For such other and further relief as the Court deems proper.

DATED this 16th day of July, 2025.

SHIELDS PETITTI & ZOLDAN, PLC

By:*/s/ Sarah N. O'Keefe*

Sarah N. O'Keefe
Michael J. Petitti, Jr.
5090 N. 40th Street, Suite 207
Phoenix, Arizona 85018
Attorneys for Plaintiffs