**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Kathleen Iudicello,<br>Plaintiff,<br>v.<br>Arizona Western College, et al.,<br>Defendants. | No. CV-25-02510-PHX-DJH<br><br>**ORDER** |

Defendants Arizona Western College ("Arizona Western"), the District Governing Board for Arizona Western College ("Board"), the Board Members Brad Sale, Dr. Kenneth McFarland, Dennis Booth, Olivia Zepeda, and Maria Chavoya (collectively, "Board Members"), and Arizona Western's President Dr. Daniel Corr ("Corr") (collectively, "Defendants") have filed a Partial Motion to Dismiss seeking to partially dismiss Plaintiff Kathleen Iudicello's ("Iudicello") Arizona Equal Protection Act ("AEPA") claim; and fully dismiss her claims for violation of the First and Fourteenth Amendments under 42 U.S.C. § 1983, violation of the Fourth Amendment under § 1983; violation of the Computer Fraud and Abuse Act ("CFAA"); violation of the Arizona Constitution's "Private Affairs Clause"; and common law invasion of privacy. (Doc. 17). Iudicello has responded and Defendants have replied. (Docs. 20 & 21). For the reasons stated below, the Court will grant in part, and deny in part Defendants' Motion.

/ / /

/ / /

## I. Background

Arizona Western is part of the community college system in Arizona and is accredited by the Higher Learning Commission ("HLC"). (Doc. 1 at ¶¶ 12–13). Arizona Western is governed by the five-member Board and Corr, the President of the college. (*Id.* ¶¶ 3–5).

As part of its services, Arizona Western offers dual enrollment to high school students, which allows them to take courses for academic credit, fulfill graduation requirements, and earn college credit. (*Id.* at ¶ 13). According to Iudicello, Arizona Western benefits financially from the Dual Enrollment Program because it gets reimbursed by the Arizona Department of Education. (*Id.* at ¶ 14). To receive this financial reimbursement, A.R.S. § 15-1821.01 (hereafter, the "state statute") sets forth guidelines for the courses and how they are structured. (*Id.* at ¶ 15). Additional guidelines, specifically as they relate to faculty hiring for the dual enrollment courses, are established by the HLC. (*Id.* at ¶ 16).

In March of 2023, Iudicello accepted a position with Arizona Western as Vice President of Learning Services ("VPLS"), "where the main focus was how Iudicello could support Defendant Corr's vision to grow Dual Enrollment." (*Id.* at ¶¶ 21–22). She started the position on July 10, 2023. (*Id.* ¶ 25). As the VPLS, Iudicello was also the Chief Academic Officer for Arizona Western, in which she oversaw, in relevant part, the academic and instructional component of the Dual Enrollment Program. (*Id.* at ¶ 26). She reported directly to Corr. (*Id.* at ¶ 27).

In August of 2023, Iudicello created a Dual Enrollment Faculty Liaison position to establish communication between the dual enrollment instructors and Arizona Western faculty for course curriculum and adherence to state-mandated standards. (*Id.* at ¶ 28). Iudicello alleges this role was "subsequently rendered ineffective" when Corr directed that only an Early College Team, which did not include any full-time Arizona Western faculty, could communicate with the high schools. (*Id.* at ¶ 29).

Iudicello alleges she repeatedly brought her concerns about the Dual Enrollment

Program's lack of compliance with state law and the HLC to Corr. (*Id.* at ¶¶ 30–35). She says that Corr held firm to his stance that Arizona Western was exempt from the state statute and HLC guidelines because it had a waiver. (*Id.* at ¶ 36). Iudicello alleges no such waiver existed. (*Id.* at ¶¶ 38–39).

In December of 2023, in response to concerned faculty, Iudicello alleges she formed a Dual Enrollment Faculty Taskforce ("Taskforce"), as required by the state statute. (*Id.* at ¶ 42). The Taskforce consisted of "discipline-specific full-time faculty providing the required information as outlined by the State Statute and providing the support that faculty were seeking." (*Id.* at ¶ 42). Though the Taskforce provided advice to Corr and sought to meet with him, he disregarded their input. (*Id.* at ¶¶ 44–45). The main disagreement between Corr and Iudicello was whether dual enrollment courses should continue to be taught by teachers with only Bachelor's degrees and whether practices meant to ensure success and compliance with the state statute and the HLC guidelines were being implemented. (*Id.* at ¶¶ 30–30, 51).

Iudicello alleges she sent an email requesting that the Learning Services Associate Deans and Early College Team "remove the approval of teachers with a Bachelor's Degree in Education from Dual Enrollment courses." (*Id.* at ¶ 59). The response from Corr was to send his own email asking the Dean of Learning Services to cease contact with Iudicello regarding early college or dual enrollment issues. (*Id.* at ¶ 61).

The conflict reached its zenith when Iudicello and Corr met with Human Resources to discuss Iudicello's purported insubordination. (*Id.* at ¶ 62). Iudicello asserts she resigned herself to Corr's directive that she no longer have any involvement with the Dual Enrollment Program. (*Id.* at ¶ 65). Under Corr's directions and revisions, she sent apology emails to various members of Corr's cabinet. (*Id.* at ¶ 67). She alleges that even following these events, Corr continued to represent that Arizona Western had a waiver to not be compliant with state laws for dual enrollment. (*Id.* at ¶¶ 71–72). Iudicello alleges that despite Corr not wanting Iudicello involved in the Dual Enrollment Program, he reiterated to her on November 26, 2024, that he still expected her to ensure that Arizona Western was

following state disclosure laws for dual enrollment. (*Id.* at ¶ 77). Eventually Iudicello met with the Maricopa County Community College District and shared her concerns about Arizona Western's lack of compliance with state laws for its Dual Enrollment Program. (*Id.* at ¶ 73).

On December 9, 2024, Iudicello alleges that an email was sent to the President's cabinet about an Executive Session meeting concerning her termination. (*Id.* at ¶¶ 78–79). Iudicello asserts she was not provided with any written notice nor an opportunity to request a public hearing. (*Id.* at ¶ 80). The next day, Iudicello says Corr fired her and told her to immediately leave the campus. (*Id.* at ¶¶ 81, 84). Iudicello complied, leaving behind her work belongings, including her work-issued laptop computer. (*Id*. at ¶ 84).

At some point after her termination, Iudicello alleges she accessed her personal Gmail account to review folders saved therein, including one titled "AWC" and "Wrongful Termination Protection" containing "documents, emails, and notes relevant" to her concerns about the Dual Enrollment Program and Corr's conduct. (*Id.* at ¶ 93). Iudicello asserts she maintained these folders "given the deterioration of [her] relationship with Corr and his increasingly threatening and hostile and retaliatory conduct." (*Id*. at ¶¶ 93, 95). However, those folders were nowhere to be found in her personal Gmail account. (*Id.*) Additionally, she alleges that other folders "containing her and her family's personal information and data were [] inexplicably empty." (*Id.* at ¶¶ 93, 95). She went into the trash folder of her personal Gmail account to see if the folders were in there but also found it to be empty. (*Id.* at ¶ 99).

Iudicello reviewed the devices where her personal Gmail account was logged in and saw that it was no longer logged in on her work-issued computer. (*Id.* at ¶ 98). Iudicello states she had previously signed into her personal Gmail account on her work-issued computer and stored her log-in information there. (*Id.* at ¶ 84). Upon review of her personal Gmail account's login activity, she alleges that on the day of her termination, someone logged into her personal Gmail account via her work-issued computer. (*Id.* at ¶ 98). She alleges that she did not access her personal Gmail account via her work-issued

computer that day. (*Id.*) Based on this information, Iudicello asserts upon information and belief, Arizona Western, at Corr's direction, "erased Dr. Iudicello's personal and private data from her Gmail account from January 5, 2015, to September 5, 2024." (*Id.* at ¶ 94).

Following these events, Iudicello filed a Complaint asserting the following six claims: (1) a violation of the Arizona Employment Protection Act ("AEPA") against Arizona Western, the Board, and Corr; and as against all Defendants (2) violations of the First and Fourteenth Amendments under 42 U.S.C. § 1983, (3) violation of the Fourth Amendment under 42 U.S.C. § 1983, (4) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, ("CFAA"), (5) violation of Article 2, Section 8 of the Arizona Constitution ("Private Affairs Clause"); and lastly (6) a common law invasion of privacy intrusion upon seclusion. (*Id.* at ¶¶ 103–68). [1][2]

## II. Legal Standard

To state a claim, "a pleading" need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Nevertheless, Federal Rule of Civil Procedure ("Rule") 12(b)(6) provides that a party may move to dismiss claims "in any pleading" for "fail[ing] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In other words, a Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the claims alleged in the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A court may dismiss a complaint if it lacks a cognizable legal theory or there is an absence of sufficient facts alleged under a cognizable legal theory. *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court

[1] Iudicello mislabeled her fourth cause of action as her fifth cause of action. (Doc. 1 at 31). In its entirety, Iudicello brings six claims, not seven.

[2] Iudicello does not specify which Defendant(s) invaded her privacy. (*Id.* at 34).

"accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008); *Maya v. Centex Corp.*, 658 F.3d 1060, 1067–68 (9th Cir. 2011). However, the court does not have to accept as true conclusory allegations or legal claims asserted in the form of factual allegations. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

## III. Discussion

### A. Arizona Employment Protection Act

Defendants first argue that Iudicello's AEPA claim should be dismissed as to the Board, Board Members, and Corr because such claim can only be brought against an employer.[3] (Doc. 17 at 5). According to Defendants, because only Arizona Western is Iudicello's employer, she can only pursue her AEPA claim against Arizona Western. (*Id.*) Iudicello counters that "employer" under the AEPA includes supervisors with day-to-day authority over an employee and those with the power to terminate employment. (Doc. 20 at 3–4). She counters that Corr exercised control over her employment duties and the Board ratified the ultimate decision to terminate her employment; therefore, they can all be held individually liable under the AEPA. (*Id.*)

Under the AEPA, an employee may bring a claim for wrongful termination if the employer terminated the employment relationship in violation of public policy. A.R.S. § 23-1501(A)(3). Notably, the term "employer" is not defined by the statute. Arizona courts have interpreted "employer" to include supervisors with "day-to-day control", including the authority to terminate employees, for purpose of individual liability under the AEPA. *Higgins v. Assmann Elecs., Inc.*, 173 P.3d 453, 458 (Ariz. Ct. App. 2007). The court in *Higgins* rejected the argument that supervisors or agents of the employer could not be individually liable under the AEPA. 173 P.3d at 457–58. *Higgins* reasoned that unlike other employment-related statutes, such as Title VII, Age Discrimination in Employment

[3] Iudicello's Complaint brings this claim against "Arizona Western, [the] Board, and Corr" (Doc. 1 at 24). Defendants moved to dismiss this claim against the Board, Board Members, and Corr. (Doc. 17 at 5). Accordingly, the Court will determine whether her claim against the Board Members fail as a matter of law.

Act, 29 U.S.C. §§ 621 to 634, and Arizona's Civil Rights Act, A.R.S. § 41–1461, the AEPA does not include language that would shield the employer's agents from individual liability. *Id.* The court in *Higgins* affirmed the jury's verdict that the supervisor was individually liable under the AEPA because he "committed the acts constituting the wrongful termination." *Id.* at 458. Accordingly, where the employer has vested an agent, such as a supervisor, with "day-to-day control", including the right to terminate employment, and the agent uses that authority to harm another, that agent can individually liable under the AEPA. *Id.*

As alleged by Iudicello, Corr exercised control over Iudicello's day-to-day activities and used his authority to wrongfully terminate her; and the Board, also with authority to terminate her employment, ratified that decision. Iudicello sets forth ample facts from which the Court can reasonably infer that Corr directed Iudicello's day-to-day activities. In fact, she was hired to support Corr's vision for the dual enrollment program, a supporting role with him as her direct supervisor. (Doc. 1 at ¶¶ 21 & 27). Even in her role as VPLS, ultimate decision-making authority rested with Corr, who decided which of her proposals to accept and which to reject. (*Id.* at ¶¶ 29–31). And Corr was directly responsible for her eventual termination when he fired her on December 10, 2024, with the Board's approval. (*Id.* at ¶¶ 81–86). At this stage of the proceedings, the Court finds that Iudicello's AEPA claim against Corr survives dismissal because Iudicello alleges sufficient facts that Corr was her supervisor with "day-to-day control", including the right to terminate employment, and used that authority to wrongfully terminate her employment.

However, the Court finds Iudicello fails to state a claim against the Board and Board Members. Unlike Corr, she does not allege that the Board or Board Members controlled day-to-day operations like the defendant supervisor in *Higgins*. 173 P.3d at 458. Her AEPA claim against the Board and Board Members is solely based on their decision to approve her termination. (*See* Doc. 20 at 4). Iudicello fails to allege any facts that plausibly support either the Board or Board Members are individually liable under the AEPA.

Furthermore, Iudicello asserted in her Complaint that she was an employee of

Arizona Western only; and makes a conclusory allegation that the Board was also an employer. (*See* Doc. 1 at ¶¶ 1, 3). Because she was not an employee of the Board, the Court finds she fails to state a claim as to the Board and Board Members and dismissal is appropriate.

**B. First and Fourteenth Amendment**[4]

Defendants argue that Iudicello cannot adequately plead a First Amendment retaliation claim because her speech was entirely within the course and scope of her employment, thereby making it unprotected speech. (Doc. 17 at 5–6). By issuing conflicting directives to Arizona Western's staff about the Dual Enrollment Program, Defendants argue that Iudicello's speech falls squarely within her employment duties. (*Id.* at 6). Iudicello counters that she engaged in a course of conduct that went beyond her official employment duties. (Doc. 20 at 5). For example, she argues she contacted the HLC on her own initiative, independent of her job duties. (*Id.*) Other examples she cites include contacting the Arizona Department of Education and the Maricopa County Community College District's Faculty Association. (*Id.*)

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). However, "while the First Amendment invests public employees with certain rights, it does not empower to 'constitutionalize the employee grievance.'" *Id.* at 420 (quoting *Connick v. Myers*, 461 U.S. 138, 154 (1983)). The Ninth Circuit has articulated a factored test for evaluating First Amendment retaliation claims: (1) that the plaintiff spoke on a matter of public concern; (2) that the plaintiff spoke as a private citizen rather than a public employee; and (3) that the relevant speech was 'a substantial or motivating factor in the adverse employment action.'" *Coomes v. Edmonds School Dist. No. 15*, 816 F.3d 1255, 1259 (9th Cir. 2016) (quoting *Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009)). If the plaintiff satisfies the first three *Eng* factors, "the burden of

---

[4] While Iudicello brings a 42 U.S.C. § 1983 action under both the First and Fourteenth Amendments, Defendants do not argue for dismissal of a Fourteenth Amendment claim in its Motion (Doc. 17 at 5–6).

proof shifts to the government to show that (4) 'the state had an adequate justification for treating the employee differently from other members of the general public'; or (5) 'the state would have taken the adverse employment action even absent the protected speech.'" *Id.* (quoting *Eng*, 552 F.3d at 170–72). The critical question in this inquiry is "whether the speech at issue itself is ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 270 (2014). The Court finds that at this juncture, Iudicello's First Amendment retaliation claim can withstand Defendants' Motion.

Additionally, the scope of an employee's duties is a question of fact. *Robinson v. York,* 566 F.3d 817, 823–24 (9th Cir. 2009). Generally, the Court should reserve judgment on whether speech was within an employee's official job duties until after the fact-finding process has ended. *Posey v. Lake Pend Oreille Sch. Dist. No. 84,* 546 F.3d 1121, 1123 (9th Cir. 2008). While the Ninth Circuit has listed non-exhaustive factors to determine if a plaintiff was acting within the scope of their employment duties, going outside the chain of command is one such relevant factor. *Dahlia v. Rodriguez*, 735 F.3d 1060, 1074 (9th Cir. 2013). Critically, Iudicello highlights that she went beyond her job duties when she raised concerns regarding Arizona Western's lack of compliance with the state statute and the HLC's guidelines for dual enrollment. (Doc. 20 at 5). Iudicello argues that she went outside of normal grievance channels to address Arizona Western's lack of compliance, including speaking with officials from the Arizona Department of Education and the Maricopa County Community College Association. (Doc. 20 at 5). At this stage, Iudicello provides sufficient factual development to state a claim.

### C. Fourth Amendment

Defendants maintain that Iudicello did not have a reasonable expectation of privacy in her work-issued computer as reflected by Arizona Western's policy with respect to such computers. (Doc. 17 at 8). Defendants say that Arizona Western's policy states "The College's administrators reserve the right to suspend or examine any account, computer, or network access information, including the content of emails sent by or to any network

user and the websites visited by any user" and that "Users of this system do not have an expectation of privacy in their use of the College's network or computer system." (Doc. 17 at 8).[5] Iudicello does not dispute that Arizona Western had a right to inspect her work-issued computer. (Doc. 20 at 6). She says, however, that claim "arises not from any search of AWC-owned systems, but from Defendants' unauthorized access to her personal Gmail account—a private, password-protected email service maintained on Google's servers." (*Id*. at 6–7). She says Defendants accessed and deleted files, emails, and documents stored on her personal Gmail account that just happened to be accessible via her work-issued computer. (Doc. 20 at 6–7). She maintains that Defendants had no right to access and delete her personal emails, and files stored therein, even if Defendants could access her account via her work-issued computer. (*Id.*) The Court again agrees with Iudicello.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. The rights enshrined in the Fourth Amendment extend well beyond the criminal context and apply when the government acts as an employer. *Treasury Employees v. Von Raab,* 489 U.S. 656, 665 (1989). However, in place of the usual probable cause and warrant requirements, Fourth Amendment protections in the workplace are "judged by the standard of reasonableness under all the circumstances." *O'Connor v. Ortega*, 480 U.S. 709, 710 (1987). A reasonable expectation of privacy exists where a person has both a subjective

---

[5] Defendants presume the Court may consider Arizona Western's Procedural Manual because Federal Rule of Evidence 201 allows a court to take judicial notice of facts that are not subject to reasonable dispute. (Doc. 17 at 8). In considering a motion to dismiss under Rule 12(b)(6), a court's review is generally "limited to the complaint." *Lee v. City of L.A.*,250 F.3d 668, 688 (9th Cir. 2001). One exception is if the court can take judicial notice of a fact. Under Rule 201(b), a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." For a fact to be judicially noticed, the Ninth Circuit has explained that "indisputability is a prerequisite." *Lee*, 250 F.3d at 689. "[T]he kind of things about which courts ordinarily take judicial notice are: (1) scientific facts: for instance, when does the sun rise or set; (2) matters of geography: for instance, what are the boundaries of a state; or (3) matters of political history: for instance, who was president in 1958." *Mat-Van, Inc. v. Sheldon Good & Co. Auctions, LLC*, 2008 WL 346421, at *8 (S.D. Cal. Feb. 6, 2008). Because Plaintiff arguably disputes the Policy's scope, the Court declines to take judicial notice of it for this Motion but includes the language from the referenced Policy to analyze the arguments made in the briefing.

expectation of privacy and the expectation is one society is willing to recognize as reasonable. *Katz v. United States*, 389 U.S. 347, 361 (1967). In the workplace context in particular, this determination is made on a case-by-case basis. *O'Connor*, 480 U.S. at 718. The following list provides some guideposts to determine if there is a reasonable expectation of privacy: (1) whether what was searched or seized was shared with other employees; (2) whether there were items that were unconnected to the employment in what was searched or seized; and (3) whether there was a policy discouraging employees from mixing personal with professional items and documents. *Id.* at 718–19.

The Court finds that Iudicello had a reasonable expectation of privacy in her personal Gmail account even if her login information was stored on her work-issued computer. To start, her work-issued computer was not shared with other employees, nor was her personal Gmail account. The items she said she stored in her personal Gmail account were not all related to her employment. In fact, while she alleges that some of the files in her personal Gmail account were work related and about the Dual Enrollment Program, many of the files, emails, and documents were personal and private in nature, such as "medical records, healthcare information, financial matters, investment data, legal documents, insurance information, purchase history, warranty information, property information, tax material, vehicle data, bills and utilities information, professional communications, and of course, a plethora of personal information related to her daughter and the rest of her family." (Doc. 1 at ¶ 95). And while Arizona Western may have a policy in place that it could access employees' work-issued computers and review the use of anything sent or reviewed over the company network, the policy does not mention anything about using or reviewing personal emails on the work-issued computer. (*See* Doc. 17 at 8, n. 4, Arizona Western College, Procedure Manual, Procedure 223.001). At this stage, when all well-pleaded allegations are accepted as true, the Court concludes that Iudicello's Fourth Amendment claim should not be dismissed. *Iqbal*, 556 U.S. at 678.

Lastly, Defendants also argue that Iudicello cannot bring a municipal liability, or a *Monell* claim, against Arizona Western because she has not shown or alleged that Arizona

Western was responsible for perpetuating a policy or custom that was the root cause of the Fourth Amendment violation. (Doc. 17 at 9). There are separate tracks to bring a *Monell* claim against an entity: (1) an unconstitutional policy, custom or practice, (2) inadequate training, and/or (3) ratification. *See Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 802–03 (9th Cir. 2018). First, "a local government may be liable if 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict[ed] the injury.'" *Id*. (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978)). Second, "a local government can fail to train employees in a manner that amounts to 'deliberate indifference' to a constitutional right, such that 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Id*. (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). Third, "a local government may be held liable if 'the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it.'" *Id*. (quoting *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2018)).

Although Iudicello does not respond to Defendants' argument, she states the relevant objection in her Complaint: "Upon information and belief, [Arizona Western], at Defendant Corr's direction, erased Dr. Iudicello's personal and private data from her Gmail account from January 5, 20125, to September 5, 2024." (Doc. 1 at ¶ 94). It appears to the Court that Iudicello is alleging the ratification theory of *Monell*. That is, at Corr's direction, agents or officials went into Iudicello's personal Gmail account, accessed her files and documents, and deleted them. Taken as true, this states enough facts to state a claim that is plausible on its face. *Iqbal*, 556 U.S. at 678.

**D. CFAA**

Defendants contend Iudiciello fails to state a claim under the CFAA because (1) she has not alleged that Defendants' access to her personal Gmail account via her work-issued

computer was without authorization or in excess of their authorized access and (2) she failed to allege the required damages or losses. (Docs. 17 at 10–11; 21 at 2).

The CFAA is a federal criminal statute that also authorizes civil actions for any person who suffers damage or loss by reason of a violation of the statute. 18 U.S.C. § 1030(g). Iudicello alleges Defendants violated three sections of the CFAA: sections 1030(a)(2)(C), (4), and (5). (Doc. 1 at ¶ 152). Although each of these subsections have different substantive requirements, there are two threshold requirements that apply to them all: a defendant must (1) access a protected computer without authorization or in excess of authorized access; and (2) the unlawful access must cause some form of damage or loss. *See LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1131 (9th Cir. 2009) ("Thus, a private plaintiff must prove that the defendant violated one of the provisions of § 1030(a)(1)–(7), and that the violation involved one of the factors listed in § 1030(a)(5)(B)."); *see also United States v. Nosal (Nosal II)*, 844 F.3d 1024, 1033 (9th Cir. 2016) (recognizing that when interpreting terms found throughout § 1030, such as "without authorization", the court must be "cognizant of the need for congruence among these subsections").

**1. Access to Computer Without Authorization or in Excess of Authorized Access**

Defendants first contend Iudicello fails to state a claim because the CFAA does not provide a cause of action where the defendant accesses its own computer. (Docs. 17 at 10; 21 at 7). Iudicello counters that her personal Gmail account and files therein were stored on a third-party server, not on any of Arizona Western's computers, and thus it was not on one of Defendants' computers. (Doc. 20 at 7). The Court is not persuaded that Defendants' argument requires dismissing Iudicello's CFAA claim.

Defendants say they had authorization to access all parts of the work-issued computer that is the basis of Iudicello's CFAA claim. (Doc. 17 at 10). Citing the Supreme Court's holding in *Van Buren v. United States*, 593 U.S. 374 (2021), Defendants say that the CFAA only applies to "those who obtain information from particular areas in the computer—such as files, folders, or databases—*to which their computer access does not extend*." (Doc. 17 at 10) (quoting *Van Buren*, 593 U.S. at 378) (emphasis added).

Defendants reason that because Arizona Western owns the computer at issue, their access "necessarily extends to all areas" in the computer, including Iudicello's personal Gmail account and the information, files, and folders stored therein. (*Id.*) But Defendants' argument goes beyond *Van Buren*'s holding.

In *Van Buren*, the Supreme Court reversed the conviction of a police officer convicted of violating the CFAA by using his work-issued computer and valid credentials to log into his employer's database to retrieve information for an improper purpose. 593 U.S. at 382. The Supreme Court considered whether Van Buren's conduct "exceed[ed] authorized access" within the meaning of the CFAA. *Id.* First, the Court interpreted the CFAA's "without authorization" clause to apply to "outside hackers—those who 'acces[s] a computer without any permission at all.'" *Id.* at 389 (quoting *Brekka*, 581 F.3d at 1133). On the other hand, the Court explained that the "exceeds authorized access" clause works to defend computers against "inside hackers—those who access a computer with permission, but then 'exceed the parameters of authorized access by entering an area of the computer to which that authorization does not extend.'" *Id.* at 389–90 (quoting *United States v. Valle*, 807 F.3d 508, 524 (2d Cir. 2015)). The Court stated that "liability under both clauses stems from a gates-up-or-down inquiry—one either can or cannot access a computer system, and one either can or cannot access certain areas within that system." *Id.* at 390. Under the facts of that case, the Court found that the defendant employee did not "excee[d] authorized access" to his employer's database because he was authorized to access and retrieve the information. *Id.* at 396. There was, therefore, no liability under the CFAA.

The CFAA was meant to "prevent intentional intrusion onto someone else's computer[.]" *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1196 (9th Cir. 2022). Defendants reason that because they did not use another's computer to access Iudicello's personal Gmail account they cannot be liable. (Doc. 17 at 10). But Defendants' argument is premised on a narrow and erroneous definition of "computer" or "protected computer" within the meaning of the CFAA.

The CFAA defines "computer" as "an electronic, . . . or other high speed data processing device performing . . . storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." 18 U.S.C. §§ 1030(e)(1). Subsection 1030(e)(2) defines "protected computer" as a computer "which is used in or affecting interstate or foreign commerce or communication[.]" 18 U.S.C. § 1030(e)(2)(B). Based on these definitions, it is clear that Iudicello's work-issued computer is a "computer" or "protected computer" under the CFAA. However, Iudicello's allegations focus not on Defendants' access to her work-issued computer, but their access to her personal Gmail account, whose login credentials were saved on her work computer. The issue therefore is whether Iudicello's Gmail account can independently be considered a "computer" or "protected computer" under the statute.

The Ninth Circuit has interpreted "protected computer" to encompass "effectively any computer connected to the internet, including servers, computers that manage network resources and provide data to other computers." *hiQ Labs*, 31 F.4th at 1195 (cleaned up). Iudicello admits that she stored her login credentials to her personal Gmail account on her work-issued computer. (Doc. 1 at ¶ 84). However, she asserts that the emails, documents, and files Defendants accessed and deleted were stored in her personal Gmail account which is maintained on non-party Google's servers. (*See* Docs. 1 at ¶¶ 93, 99, 101; 20 at 7). So, when Defendants accessed her personal Gmail account via her work-issued computer, they accessed Google's servers. (Doc. 20 at 7). Defendants offered no response to this argument. (Doc. 21 at 7). Under these circumstances, the Court finds that Iudicello's work-issued computer and the servers that stored her personal Gmail account and files therein are separate and distinct "computers" or "protected computers" under the CFAA. Because Iudicello alleges in her Complaint, albeit broadly, that Defendants accessed a protected computer without authorization or in excess of authorized access, she has plausibly stated a claim under the CFAA.

Defendants' ownership of a computer that stored Iudicell's login credentials to her

personal Gmail is not dispositive.[6] Ownership of the physical device is not a required element for liability under the CFAA. *See Theofel v. Farey-Jones*, 359 F.3d 1066, 1078 (9th Cir. 2004) (finding that "[t]he district court erred by reading an ownership or control requirement into the [CFAA]. The civil remedy extends to '[a]ny person who suffers damage or loss by reason of a violation of this section.' 18 U.S.C. § 1030(g)."). In *Theofel*, the Ninth Circuit considered a case where the defendants used an unlawful subpoena to gain access to e-mails stored by the plaintiffs' internet service provider. *See id.* The district court dismissed the plaintiff's CFAA claim, holding that the CFAA did not apply to unauthorized access of a third-party's computer. *Id.* The Ninth Circuit reversed, indicating that the district court erred by reading an ownership or control requirement into the CFAA. *Id.* The *Theofel* court reasoned that "[n]othing in the provision's language supports the district court's restriction. Individuals other than the computer's owner may be proximately harmed by unauthorized access, particularly if they have rights to data stored on it." *Id.*

In light of this authority, the Court finds that Iudicello's Complaint contains sufficient factual allegations to make it at least plausible that Defendants accessed her personal Gmail account without authorization or exceeded its authorized access in violation of the CFAA. At the motion to dismiss stage, the Court screens for wholly implausible claims, not for weak ones, mindful that a complaint need not contain every conceivable fact that might bear on a question. So long as the claim is plausible, the parties may proceed to discovery, where further factual development will either strengthen or weaken Iudicello's claims.

**2. Loss under the CFAA**

Finally, Defendants argue that Iudicello has not alleged that she suffered any loss or damage within the meaning of the statute. (Doc. 17 at 11). The CFAA provides that "[a]ny

---

[6] Accepting the factual allegations of Iudicello's Complaint as true and drawing all reasonable inferences in her favor, Defendants accessed Iudicello's personal Gmail account via the work-issued computer because either her personal Gmail account remained logged in after her termination or Defendants used her login information saved on their computer to gain access her Gmail account.

person who suffers damage or loss by reason of a violation of this section may maintain a civil action[.]" 18 U.S.C. § 1030(g). It defines "damage" as "any impairment to the integrity or availability of data, a program, a system or information." *Id.* at § 1030(e)(8). Subsection 1030(e)(11) defines "loss" as "any reasonable cost to any victim, including . . . conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id.* at § 1030(e)(11). However, it specifies that a civil action requires at least one form of resulting damages or losses enumerated in § 1030(c)(4)(A)(i)(I)–(V) from the defendant's violative conduct. *Id.* at § 1030(g). While a civil plaintiff may obtain "compensatory damages and injunctive relief or other equitable relief[,]" for resulting damages or losses provided in § 1030(c)(4)(A)(i)(II)–(V), a plaintiff can only recover economic damages when damages or losses are based on § 1030(c)(4)(A)(i)(I). *Id.*

Defendants argue that Iudicello failed to allege which of the five factors applied to her claim. (Doc. 17 at 10–11). Iudicello does not respond to this argument. (Doc. 21 at 2). Nevertheless, the Court finds that Iudicello alleges sufficient facts that she suffered "damages" or "loss" within the meaning of the statute. For example, she alleges in her Complaint that, at Corr's command, Arizona Western deleted documentation concerning "her daughter and the rest of her family" spanning "from January 5, 2015, to September 5, 2024" from her personal Gmail account." (Doc. 1 at ¶¶ 94–95). She further alleges that she "expended significant time, energy and resources" in an attempt to recover the data and files deleted from her personal Gmail account. (*Id.* at ¶ 99). She contends that she has "suffered damage and loss as defined by § 1030(e)(8), including loss of data, time, and resources to attempt recovery and assess the breach." (*Id.* at ¶ 153). While the Complaint does not specifically identify which of the factors enumerated in § 1030(c)(4)(A)(i)(I)–(V) applies, the Court finds that Iudicello has sufficiently pleaded she suffered damages or losses under the CFAA as a result of Defendants' conduct to survive a motion to dismiss. The extent of Iudicello's damages can be flushed out in discovery. Because Iudicello

pleads sufficient factual allegations as to the two threshold requirements, the Court declines to dismiss this claim.

**E. Intrusion into Private Affairs**

Defendants argue that Article 2 Section 8 of the Arizona Constitution, also known as the "Private Affairs Clause," is coextensive with her Fourth Amendment rights. (Doc. 17 at 11). Therefore, Defendants argue that if Iudicello's Fourth Amendment claim fails, then her Private Affairs Clause claim also fails. (*Id.*) Defendants also argue that a private right of action under the Private Affairs Clause does not authorize damages. (*Id.* at 12). Iudicello counters that this claim is pled in the alternative to her other claims and even if she is not entitled to monetary damages, she is still entitled to declaratory and equitable relief. (Doc. 20 at 9). The Court agrees with Iudicello.

The Arizona Constitution provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." Ariz. Const. art. 2, § 8. The Private Affairs Clause preceded the Fourteenth Amendment's incorporation of the Fourth Amendment to the States, but the general effect and purpose of the Fourth Amendment and the Private Affairs Clause is the same. *State v. Mixton*, 478 P.3d 1227, 1235 (Ariz. 2021) (walking through the history of the Private Affairs Clause). The Private Affairs Clause does no more and no less than the Fourth Amendment. *Id.* at 1238. In other words, an expectation of privacy is reasonable if one has it (subjective) and society is prepared to accept it (objective). *Id.* ("[I]f the nature and use of the information is consistent with what is reasonably conceived as bring private.").

The Court finds that Iudicello has plausibly alleged a Private Affairs Clause claim. The Arizona Supreme Court has made clear in its *Mixton* opinion that because the text of the Private Affairs Clause does not provide for a definition of what is or is not considered a private affair, the only guidepost to follow is that of the Fourth Amendment. *Mixton*, 478 P.3d at 1239. If, by the contours of privacy outlined in the Fourth Amendment, a person has a reasonable expectation of privacy in their personal email account and its contents, then a Private Affairs Clause claim may go forward. *Id.* The Court found above that

Iudicello did have a reasonable expectation of privacy in her personal email account and its contents. *See supra* ¶ III.C. Moreover, this claim is plead in the alternative. *Calson Mgmt. LLC v. S&W Sols. LLC*, 2023 WL 5806602, at *6 (E.D. Cal. Sept. 7, 2023) ("Plaintiff has pled the theories in the alternative, which is permissible to survive a motion to dismiss."). Because the Court already found above that Iudicello's Fourth Amendment claim can go forward, the Court will also allow Iudicello's Private Affairs Clause claim to go forward at this time.

**F. Common Law Intrusion upon Seclusion**

Lastly, Defendants argue that Iudicello's common law intrusion upon seclusion claim must also fail because she had no reasonable expectation of privacy in a computer that was provided to her by her employer. (Doc. 17 at 13). Defendants also argue that Arizona Western's policy placed Iudicello on notice that her work-issued computer and its contents could be examined. Iudicello repeats her protests above that Defendants accessed not just the computer but her personal emails and the highly personal content within those emails. (Doc. 20 at 10). The Court again finds Iudicello's Complaint sufficiently pleads this claim.

The Restatement (Second) or Torts describes the tort of unreasonable intrusion upon seclusion as violated when: "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Rest. (2d) of Torts § 652B (1977). However, a defendant is liable "only when he has intruded into a private place or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs." *Id.* at § 652B cmt. c). The claim itself requires a plaintiff to establish two elements: (1) an intentional intrusion, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns and (2) that the intrusion would be highly offensive to a reasonable person." *Dible v. City of Chandler*, 2005 WL 8162952, at *8 (D. Ariz. Jan. 10, 2005) (citing *Med. Lab'y Mgmt. Consultants v. Am. Broad. Cos., Inc.*, 306 F.3d 806, 812–13 (9th

Cir. 2002) (applying Arizona law)).

The Court concludes that at this point in the proceedings, Iudicello has alleged that her personal email account and emails were accessed and data deleted, and this is enough to sustain an intrusion upon seclusion claim. As evidenced by Comment (b) of the Restatement, rummaging through someone else's *private mail* sets off liability under the first prong because private mail is included in a person's private affairs and concerns. Rest. (2d) of Torts § 652B cmt. b (1977) ("It may be by some other form of investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents."). The emails are analogous to Iudicello's personal mail and the facts in the Complaint permit the inference that Defendants intruded into a private place when it accessed, viewed, and deleted her personal emails. *Maguire v. Coltrell*, 2015 WL 6168417, at *6 (D. Ariz. Oct. 21, 2015) ("The defendant is subject to liability . . . only when he has intruded into a private place or has otherwise invaded a private seclusion *that the plaintiff has thrown about his person or affairs*." *Id.* (internal quotations omitted) (emphasis added) (citing § 652(B) cmt. c).

Additionally, nothing in the record at this point shows that Iudicello's personal emails were publicly shared or publicly accessible. By limiting access to her personal emails only to herself, Arizona Western's intrusion is likely to be highly offensive to a reasonable person. *Davis v. HDR Inc.*, 652 F. Supp. 3d 1087, 1097 (D. Ariz. 2023) (coming to the opposite conclusion when plaintiff shared her views with a Facebook group of over 32, 400 people). For these reasons, the Court finds that Iudicello has plausibly alleged an intrusion upon seclusion claim at this stage.

Accordingly,

**IT IS ORDERED** that Defendants' Partial Motion to Dismiss (Doc. 17) is **granted in part and denied in part**.

**IT IS FURTHER ORDERED** that Defendants' Motion is **granted in part** to the extent that Iudicello's claim for violation of the Arizona Employment Protection Act

against the Board and Board Members is **dismissed without prejudice**.

**IT IS FURTHER ORDERED** that Defendants' Partial Motion to Dismiss (Doc. 17) is **denied in part** to the extent that the Court declines to dismiss Iudicello's claims as follows: (1) violation of the Arizona Employment Protection Act against Corr; and as against all Defendants (2) violations of the First and Fourteenth Amendments under 42 U.S.C. 1983, (3) violation of the Fourth Amendment under 42 U.S.C. 1983, (4) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, (5) violation of Article 2, Section 8 of the Arizona Constitution; and lastly (6) a common law invasion of privacy intrusion upon seclusion.

**IT IS FINALLY ORDERED** that Iudicello may file an amended pleading within **20 days of this Order**. If Iudicello does not file an amended pleading within **20 days of this Order**, the Clerk shall dismiss Iudicello's Arizona Employment Protection Act claim against the Board and Board Members with prejudice.

Dated this 25th day of September, 2026.

Honorable Diane J. Humetewa
United States District Judge